**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ANTHONY Q. BRONNER,**

                                **Plaintiff,**

     **-vs-**                                                                **3:08-CV-0015**

**CATHOLIC CHARITIES OF THE ROMAN CATHOLIC**
**DIOCESE OF SYRACUSE, INC. d/b/a CATHOLIC**
**CHARITIES OF BROOME COUNTY,**

                                **Defendant.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


                                **DECISION & ORDER**

**I.      INTRODUCTION**

        Plaintiff Anthony Q. Bronner ("Plaintiff") commenced this action alleging that his

employer, Catholic Charities of Broome County ("Defendant" or "Catholic Charities"),

discriminated against him based on his race by subjecting him to a hostile work

environment, by treating him differently than Caucasian employees with respect to terms

and conditions of employment, and by terminating his employment.  Plaintiff brings his

claims under federal and New York state law.[1]  Currently before the Court is Defendant's

_____

        [1] Plaintiff sues "for damages sustained by reason of a violation of plaintiff's rights under the
Constitution of the United States, Title VII of the Civil Rights Act of 1964 and 1991 as amended, for
employment-related racial harassment and discrimination." Compl. ¶ 1. He also asserts supplemental state
law claims for "negligence, gross negligence, and a violation of New York Executive Law  §§291 and 296 of
the State of New York, and New York Civil Rights Law §§ 40-44a."

1

motion for summary judgment.

## II.   OVERVIEW OF PENDING MOTION

Plaintiff asserts claims of discrimination or retaliation concerning what appears to be every action by the employer or co-workers during (and following) Plaintiff's thirteen (13) months of employment that he did not agree with or was offended by.  See Compl. dkt. # 1.  In responding to Defendant's motion for summary judgment, Plaintiff opposes dismissal of *some* of the claims.  In opposition to the motion, Plaintiff has electronically filed a 30-page memorandum of law and one-thousand, seven-hundred and thirty-seven (1,737) pages of documents.  See dkt. # 18.  In addition, Plaintiff has "traditionally filed" a box of "confidential exhibits" which contains well in excess of four-thousand (4,000) pages of documents.

Most of the items in both sets of documents (electronically filed and traditionally filed) are "Exhibits" in excess of thirty (30) un-paginated pages, with each exhibit consisting of *various* types of documents.  For instance, electronically-filed document 18-42, entitled "Time and Payroll Records, 6/3/05-6/16/05, Plaintiff's Exhibit 36," consists of what appears to be several employees' written time sheets and various computer print-outs from the employer. Traditionally-filed document entitled "Catholic Charities Personnel File, Michael Mable, Plaintiff's Exhibit 36" consists of numerous different types of documents that, presumably, were kept in this employee's personnel file.

What is most distressing for the Court is not the sheer volume of documents, but rather the way that Plaintiff's counsel attempts to use the documents.  In most instances, Plaintiff simply cites to the documents generally, *i.e.*, a simple cite to the exhibit number,

2

and in many instances, cites to numerous exhibits to support a single proposition.
Apparently, Plaintiff or his attorneys expect the Court to wade through the mass of paper
to find whether or not the "cite" supports a proposition made by Plaintiff, or creates a
genuine issue of material fact. See fn. 8, *infra*.  The Court declines the invitation to do
counsel's work.  See Amnesty America v. Town of West Hartford, 288 F.3d 467, 470 (2d
Cir. 2002)("We agree with those circuits that have held that FED. R. CIV. P. 56 does not
impose an obligation on a district court to perform an independent review of the record to
find proof of a factual dispute.")(citations omitted); Monahan v. New York City Dep't of
Corrections, 214 F.3d 275, 291 (2d Cir. 2000)(The Local Rules require the parties "to
clarify the elements of the substantive law which remain at issue because they turn on
contested facts" and the Court "is not required to consider what the parties fail to point
out.")(internal quotation marks and citations omitted); Riley v. Town of Bethlehem, 5 F.
Supp.2d 92, 93 (N.D.N.Y.1998)(By "providing precise citations to the record where the
disputed [or undisputed] facts are located, both parties and the Court can move
immediately to the gravamen of the case; absent this forced focus, the parties' briefs can
remain, as is often the case, as 'two ships passing in the night'. . . . If the facts supporting
the arguments are in the record, counsel should be able to cite to them." ).

## III.    BACKGROUND

        Unless indicated otherwise, the following facts are taken from the parties' L.R.
7.1(a)(3) Statements of Material Facts.  The Court accepts as true those facts asserted in
the Statement of Material Facts that are admitted by the opposing party, or that are
supported by admissible evidence and not properly denied.  See L.R. 7.1(a)(3).   All facts

are viewed in the light most favorable to the nonmoving party, but "only if there is a

'genuine' dispute as to those facts."  <u>Scott v. Harris</u>, 127 S. Ct. 1769, 1776 (2007).

> **a.      Employment - General**

Plaintiff was hired as a Residence Counselor to work in Defendant's Boys of

Courage Community Residence.  The Boys of Courage Community Residence is a group

home operated under the umbrella of the New York State Office of Mental Health (OMH).

The residents consist of males between the ages of twelve (12) and eighteen (18) who

have been clinically documented as being seriously emotionally disturbed.  Most have

suffered some form of emotional and physical/sexual abuse, and many, if not all, have

been prescribed some form of medication to deal with their emotional and psychological

problems.  Residents often act out of anger or frustration in some form of socially

unacceptable behavior, such as the use of vile and degrading language, including racial

slurs.

The overall goal of the Boys of Courage program is to provide a residential setting

from which the residents will learn what is, and what is not, acceptable behavior in society.

Each resident has an individual service plan formulated by a team of professionals.

Additionally, there are "House Rules" for the residents to follow.  The House Rules are

itemized examples of improper behavior, with each behavior requiring the performance of

a task set forth on "good habit cards."  The House Rule concept had been reviewed by

OMH through its auditing practices and had been accepted as being a proper approach for

dealing with the residents' behavioral issues.

Plaintiff interviewed with Boys of Courage Program Supervisor Mark Harding.

During the interview, Harding explained that the residents were severely emotionally and

psychologically disturbed.  Harding further explained that the residents were extremely defiant, and that the Residence Counselors must be prepared to be the subject of verbal abuse from the residents, including swearing and name calling.  Plaintiff was hired to work twenty-four hours per week on a schedule to be set by his supervisor.  Plaintiff commenced his employment on May 13, 2005.

Upon his hire, Plaintiff was provided with a copy of the Catholic Charities Personnel Policies and Procedures Manual.  This provided, *inter alia*, the policies related to overtime, absences from work, tardiness, and time and attendance.  These policies advised that frequent tardiness would be grounds for disciplinary action; accurate daily records had to be kept by each employee and submitted in a timely manner; and overtime work must be approved in advance by an employee's supervisor.  Brown Aff. ¶ 11.

**b.     Employment - Discipline**

Defendant contends that, within a few months of Plaintiff's commencement of employment, Program Supervisor Harding began to observe problems with Plaintiff's work performance.  In particular, Harding observed that Plaintiff arrived late for work and changed his scheduled work hours without notifying a supervisor.  Harding also received complaints from co-workers that Plaintiff was not completing his tasks during his overnight shifts.  Initially, Harding informally (verbally) counseled Plaintiff with respect to these issues.

Defendant asserts that Plaintiff's work-related problems continued.  Accordingly, on December 27, 2005, Harding formally counseled Plaintiff by issuing him a "Desk Note."[2]

---

[2]A "Desk Note" is Defendant's formal counseling document.  Desk Notes are often accompanied by a
(continued...)

5

The Desk Note concerned Plaintiff's failure to complete his daily assigned chores, and his failure to follow the proper procedures for requesting time off and scheduling changes in his work schedule. Plaintiff denies the allegations in the December 27 Desk Note. Pl. Aff. ¶ 6.[3]  With regard to these and other asserted scheduling violations (discussed below), Plaintiff's denials are based primarily on the fact that the Catholic Charities' Boys of Courage staff schedules have been destroyed. See Stone Aff. ¶ 5.[4]  From this, Plaintiff asserts that there is "no proof" of when he was assigned certain shifts.  Pl. Aff. ¶ 6.

On February 24, 2006, Harding issued Plaintiff another Desk Note, this time on the bases that Plaintiff: (1) had been habitually tardy by approximately 15 minutes each day; (2) regularly left work up to an hour early without obtaining approval from a supervisor; and (3) was putting down more hours than he actually worked on his time sheets.  Plaintiff "den[ies] the allegations contained in Desk Note 2/24/06," and asserts:

> I was never provided with any dates or times that I was either early or late. Sometimes, I was a few minutes late, but so was the rest of the staff.
>
> No Caucasian employee was disciplined for this infraction.

---

[2](...continued)
"Corrective Action Plan."

[3]Plaintiff asserts:

I deny the allegations contained in Desk Note 12/27/05.  My chores were always completed, but my co-worker Helene Speraco would question my efficiency because I always finished my chores before she did. I never made schedule changes without permission. Catholic Charities never advised me of the dates and times of my alleged infractions. Without the Staff Schedules, there is no proof of what shift I was assigned to for any week, or who assigned me, whether any changes were made, and the circumstances under which said changes, if any, were made.

Pl. Aff. ¶ 6.

[4]("In response to Plaintiff's Request to Produce Documents, Defendant Catholic Charities advised, through its attorney, that the Staff Schedules had been destroyed. No other information was provided.")

Pl. Aff.  ¶¶ 7-8.

On March 13, 2006, Plaintiff was again formally counseled because he arrived late to his scheduled shift that day.  Plaintiff denies the allegation, contending that he was "not provided with any dates or times by my Supervisor when I was supposed to have arrived late or left early."  Pl. Aff. ¶ 9.

On May 2, 2006, Plaintiff was formally counseled for failing to appear at his shift on May 1, 2006.  Plaintiff was advised via a "Corrective Action Plan" that he would be discharged if this behavior continued.  Plaintiff denies "the allegations contained in the 5/2/06 Corrective Action Plan," and asserts:

> I never made schedule changes without permission. While I was on vacation, my schedule was changed without my knowledge because Catholic Charities needed my participation in an Incident Investigation involving resident DD and Counselor RK.

Id. ¶ 10.

In July 2006, Residential Team Leader Steve Treiber completed three (3) Corrective Action Plans based on Plaintiff's continuing attendance violations, and his failure to advise supervisors about changes in his hours.  Before Treiber provided the counseling documents to Plaintiff, Plaintiff contacted Division Director of Youth Services Tonya Brown asking to discuss certain issues concerning his employment. See Brown Aff., ¶ 15.  Plaintiff expressed concern over the use of racial slurs by the residents and told Brown that he did not believe enough was being done to end the conduct. Id.  Plaintiff also stated that he did not believe that Treiber or Program Director Brian Fish were effective in dealing with the residents and that they did not take his suggestions for dealing with the racial issues seriously. Id.

Brown suggested that they meet to discuss the matter, and she scheduled a meeting for July 24, 2006.  Brown asked Treiber and Fish to attend the meeting.  See Brown Aff. ¶ 15; Treiber Aff. 16.  Prior to the meeting, Treiber showed Brown the three Corrective Action Plans he had prepared.  See Brown Aff. ¶ 16; Treiber Aff. ¶ 17.  Treiber and Brown discussed Plaintiff's work violations and history of repeated warnings. Treiber was of the opinion that Plaintiff should be terminated.  Brown Aff. ¶ 16; Treiber Aff. ¶ 17. Brown decided, however, to discuss the incidents with Plaintiff at the July 24th meeting and to stress to Plaintiff that further misconduct would result in his discharge. Brown Aff. ¶ 16; Treiber Aff. ¶ 17.

At the July 24th meeting, Brown, Treiber, and Plaintiff first discussed issues related to the use of racial language by residents. Brown Aff. ¶ 17.[5]  Plaintiff expressed his opinion that not enough was being done to address the matter.  Id.  He suggested that the residents who used racial slurs be required to perform research and write a report regarding some aspect of African-American history.  Id.  He also suggested that some instruction be provided concerning African-American history.  Id.  Brown expressed some concern that any formalized education may go beyond the parameters of what Boys of Courage was sanctioned to do by OMH, but she told Plaintiff to put a proposal in writing and she would give it further consideration.  Id.; see Treiber Aff. ¶ 18; Bronner Dep., pp. 167-168.

Plaintiff was then presented with the Corrective Action Plans Treiber had prepared. Brown Aff. ¶ 17.  Plaintiff disputed the accuracy of the violations, and refused to sign any

---

[5]Brown contends that Plaintiff complained of language or conduct of only one or two of the residents.

of them.  Id.[6]  Brown told Plaintiff that she would investigate the incidents further and would refrain from making the three Corrective Action Plans part of his personnel file until she completed her review.  Id.  Plaintiff was advised, however, that further violations of policy would result in his termination.  Id.; see Treiber Aff. ¶ 18.

Approximately one week later, on August 2, 2006, Plaintiff failed to submit his time sheet in a timely manner.  As a result, Human Resources Director Ruthanne Bulman issued Plaintiff a Corrective Action Plan that contained a final warning advising that Plaintiff would be terminated if he did not submit his time sheets in a timely manner or if he modified his work schedule without proper approval.  See Bulman Aff. ¶ 7.[7]  Plaintiff "admits . . .  the language contained in the August 2, 2006 Corrective Action Plan.

---

[6] Plaintiff points to the lack of Staff Schedules to support his denial, asserting:

I deny the allegations contained in the July 12, 2006 Corrective Action Plan. I do not recall ever coming to work without permission from a supervisor.

Staff Schedules, which would have shown my schedule and assigned shifts, were destroyed by Catholic Charities.

I deny the allegations contained in the July 19, 2006 Corrective Action Plan for the reasons I wrote on the form itself.  I called Justin DeRigo and told him I had chest pains and a doctor's appointment.

I deny the allegations contained in the July 24, 2006 Corrective Action Plan. I was not even scheduled to work during this period. The Staff Schedules, which would have documented this information, have been destroyed by Catholic Charities.

Pl. Aff. ¶¶ 11-14.

[7] This final warning advised Plaintiff that

[p]er agency policy, Mr. Bronner is responsible for keeping an accurate time sheet. Mr. Bronner will submit an accurate time sheet to his supervisor by 9:00 a.m. the Friday after the end of each pay period. Mr. Bronner will work his set schedule and receive supervisory approval prior to making any change in his work schedule. Mr. Bronner will submit time off request forms for any required scheduled time off at least one week in advance. Supervisor will monitor times use and time sheets for accuracy.  Any further infractions to this corrective action plan will result in immediate termination.

Def. Ex. 23.

However, Plaintiff denies that said allegations are true." Pl. Response to Def. L. R.

7.1(a)(3) Stat., ¶ 28 (citing Bronner Affi. ¶ 6; Stone Aff. ¶ 5; Ex. 68; Confidential Exs.

23-48).  Despite Plaintiff's denial, the cited evidence fails to create a genuine question of

material fact as to the issues addressed by the August 2, 2006 Corrective Action Plan.[8]

On August 11, 2006, Plaintiff again failed to submit his time sheet in a timely

manner.  Bulman contacted Brown to inform her of the situation and recommended that

---

[8]Plaintiff has made general denials to most of the allegations supported by Defendant's evidence, such as contained in the text above.  While Plaintiff cites to exhibits contained in the over 6,000 pages of documents that he submitted in opposition to the pending motion, the citation is often so generalized that it offers little, if anything, to aid the Court in determining whether a whether a *genuine* factual dispute exists.

For example, he cites to his attorney's affidavit at paragraph 5.  Attorney Stone asserts at ¶ 5: "In response to Plaintiff's Request to Produce Documents, Defendant Catholic Charities advised, through its attorney, that the Staff Schedules had been destroyed. No other information was provided."  The lack of the staff schedules does not support Plaintiff's denial that on August 2, 2006, he failed to submit his time sheet in a timely manner.

Pl. Ex. 68 is a summary entitled "VACATION AND PERSONAL LEAVE HOURS  MAY 13, 2005· AUG. 11,2006".  It is unclear who prepared the document or whether it is accurate. Further, there are no notations in the document pertaining to Plaintiff for August 2006, so the Court does not see how the exhibit supports Plaintiff's denial.

Confidential Exhibits 23-48, when stacked together, are approximately 24 inches thick.  The documents are un-paginated. The Court declines to search the record for evidence of material questions of fact where counsel has failed to provide proper citations to the record.

The only citation that arguably supports Plaintiff's "denial" is his affidavit at paragraph 16 wherein he asserts:

I deny the allegations contained in the August 2, 2006 Corrective Action Plan. Catholic Charities complains of my time sheets and scheduling changes, but no actual time sheet or scheduling violations were ever brought to my attention.  I never knew the date or time or schedule change that was a problem.  Furthermore, I was charged on August 2 with an alleged violation dated June 2006.  Plaintiff's Exhibit 24.

Pl. Aff. ¶ 16.

However, Exhibit 24 does not support his denial.  Exhibit 24 (containing several counseling documents) includes the August 2 Corrective Action Plan. This documents clearly informs Plaintiff that he is being counseled because he failed to submit a time sheet "[o]n 8/2/06," and references the June 06 dates as prior violations to demonstrate that "Mr. Bronner knows that it is his responsibility to" timely submit his times sheet. Pl. Ex. 24. The allegation that he "was charged on August 2 with an alleged violation dated June 2006" is belied by his own exhibit.

Plaintiff be discharged.  Brown concurred.  As a result, Plaintiff was notified that his

employment was terminated effective August 11, 2006.  See Bulman Aff. ¶ 8; Brown Aff.,

¶ 20; Bronner Dep., pp. 177-181; Exhibit 24-25.  Plaintiff asserts, however:

> I deny the[se] termination allegations . . . .   I was placed on probation for
> three days and then terminated. The allegations in the 8/11/06 Memo are
> false.  It never happened.  Plaintiff's Exhibit 24.  This is why I had to
> complain to the Department of Labor to be paid.

Pl. Aff. ¶ 17.

### c.      Racial Language & Conduct by Residents

Plaintiff contends that, while employed, he was subjected to almost daily racial

epithets and "racially motivated physical threats and intimidation" by residents.  He

maintains that, despite discussing his concerns with Steve Treiber and Mark Harding, see

Treiber Aff. ¶ 8; Harding Aff. ¶ 11; Bronner Dep., pp. 65-66, 73-74, the employer failed to

put an end to the situation.

There is no dispute, however, that in response to Plaintiff's concerns, the House

Rules were amended to make the use of racial slurs or insults a separate transgression

from swearing or name calling.  To stress the additional weight placed on the use of racial

insults, a violation of that rule resulted in the issuance of ten (10) "good habit" cards as

opposed to one (1) for swearing or name calling. See Brown Aff. ¶ 9; Harding Aff. ¶ 11;

Bronner Dep. pp. 60-61, 68; Def. Ex. 13.  Defendant also instituted a requirement that an

offending resident write a letter of apology. Brown Aff. ¶ 9.

Plaintiff never submitted a written plan to either Treiber or Brown regarding his

proposal that residents who used racial language be required to do research and write a

report concerning some aspect of African- American history. See Brown Aff. ¶ 16;Treiber

11

Aff., ¶ 9; Bronner Dep, pp. 89-90.  However, Plaintiff was permitted to act on his suggestions, including having residents look up in the dictionary the meaning of certain words. See Bronner Dep., pp. 65-66, 70-72, 74-75, 86-89.

The residence counselors at Boys of Courage maintain log books in which they make regular entries (not greater than 15 minute intervals) detailing events in the residence, including notations about residents' behavior. See Brown Aff. ¶ 25; Bronner Dep. pp. 68-69.  In addition, counselors often enter a brief summary of events or issues related to each resident during a shift. See Brown Aff., ¶ 25; Bronner Dep., p. 69. Plaintiff's practice was to highlight instances of racial language used by residents in the log book, either by way of a specific entry, or by inclusion in the shift summary.  See Bronner Dep., pp. 69-70; Pl's Resp. Def.'s 1st Interrog., pp. 2-3.

During the course of Plaintiff's employment, there were approximately 24 instances where Plaintiff or other counselors made entries regarding the use of racial language by residents.  Of those 24 incidents, seventeen (17) were racial insults directed at counselors, including two (2) to Bronner.  Seven (7) incidents were between residents. See Brown Aff. ¶ 26.  Plaintiff asserts, however, that "numerous instances of racial slurs and aggression occurred that were not recorded in the Log Books because the supervisor did not want the Log Books to be crowded."  Pl. Aff. ¶ 37.  He asserts that he and two other minority workers "were subjected to racial epithets and racially motivated physical threats and intimidation by residents that were not addressed or taken seriously by defendant's supervisors."   Pl. Aff. ¶ 42.

Plaintiff contends that when he told his supervisor, Steve Treiber, that he "was uncomfortable being called a 'nigger' and threatened on a daily basis by the residents,"

12

Treiber "advised [him] that being called a 'nigger' was the same as being called an asshole, therefore it was okay."  Pl. Aff. ¶ 43.  Plaintiff further contends that "I had group meetings with my supervisors every week during the course of my employment where I complained about the racial intimidation, ridicule and insult, but the racially discriminatory treatment did not stop." Pl. Aff. ¶ 44.

### d.   Racially Motivated Conduct by Co-Workers

Plaintiff also asserts that his co-workers engaged in racially motivated conduct that caused a racially hostile work environment.  In this regard he asserts:

45.   I was present when supervisor Lisa Endres made racially insensitive comments about resident [T. S.] who is Hispanic, and his family, referring to them as beggars and also referring to the family's living conditions in a negative and vile fashion.

46.   Helene Speraco, a long-time employee of defendant, on a continuous, frequent and pervasive basis, racially harassed plaintiff and other African-Americans at the workplace by discriminatory intimidation, insult and ridicule by comments such as the Black employees were lazy, by constantly questioning only the Black employees' work ethic and by calling plaintiff lazy in front of the residents.

47.   Despite continuous complaints made by me, defendant's supervisors, including Mark Harding failed to correct Ms. Speraco's racial discrimination. Defendant's white employees, including, but not limited to Jennifer Grady, Ryan Kzymark and Joseph White, were not subjected to this same treatment.

48.   These racially hostile types of comments were a common occurrence at my workplace.

49.   I was constantly told by my supervisors, namely Mark Harding, Justin Derigo and Brian Fish, to overlook these type of racially hostile comments because that's just the way things were.

Pl. Aff. ¶¶ 45-49.   He also asserts that Lisa Endres made "black jokes" at the work place,

13

and that she referred to her husband's son as a drug dealer and thug.[9]

Plaintiff admits, however, that (1) he never heard Helene Speraco state that "all the Black employees are lazy"; (2) he does not remember the substance of any "black joke" allegedly told by Lisa Endres; and (3) aside from Helene Speraco and Lisa Endres, Plaintiff does not assert that any other co-worker made any comments of a racial nature to him. Pl. Response to Def. L.R. 7.1(a)(3) Stat., ¶¶ 65-68.

### e.    Denial of Promotions/Yearly Review

Plaintiff asserts that, because of his race, he was not informed of promotional opportunities, was denied a yearly evaluation in 2006, and was not promoted. Pl. Aff. ¶ 52.[10]  He admits, however, that (1) two employees who received promotions to the Senior Counselor position (Brian Fish and Tom Smith) were more qualified then he was; (2) he knew about an opening for a third Senior Counselor position (eventually given to Justin DeRigo) a "couple of days" before the deadline, but did not apply because he did not think he would get the promotion; and (3) he did not apply for any openings for Senior Counselor positions. Pl. L.R. 7.1(a)(3) Resp., ¶¶ 39- 43.[11]  Plaintiff provides no basis upon

---

[9]Lisa Endres is married to an African-American man.

[10]In this regard he asserts:

I allege that I was passed over for promotions because of my race. I was not timely informed of available promotions but white employees, including but not limited to Justin Derigo, Tom Smith and Brian Fish, were. I was not given a yearly review, but white employees were. I was never given the opportunity to be a primary counselor or the opportunity to advance to a senior counselor position, but white employees, named herein, were.

Pl. Aff. ¶ 52.

[11]Plaintiff also concedes that, at the time the Senior Counselor position was open, Justin DeRigo had worked at Boys of Courage for 1 and 1/2 years longer than he did; that DeRigo had experience working with youth prior to his employment with Catholic Charities, including volunteer work as a high school athletic coach

(continued...)

which to conclude that the employer prevented him from learning of openings for any positions, or that he ever applied for any promotion.  His allegations of racial discrimination are based upon the fact that promotions to the Senior Counselor position were awarded to Caucasians, but he provides no indication of the basis for his allegations relative to the primary counselor position.

Regarding Plaintiff's 2006 yearly evaluation, there is no dispute that Mark Harding, Plaintiff's supervisor, left his employment with Catholic Charities without completing several yearly evaluations.  These included evaluations for Bronner and several Caucasian employees. Id. ¶¶ 47-48.   There is also no dispute that "[d]espite not receiving a written performance evaluation [in 2006], Plaintiff did receive a pay raise."  Id. ¶ 49.

### f.    Overtime Pay

Plaintiff contends that his supervisors asked him to work overtime on several occasions but he received compensatory time pay, not overtime pay.  He asserts that "Caucasian Boys of Courage staff, including but not limited to Wendy Halik, were given overtime pay" in similar circumstances. Pl. Aff. ¶ 70.

There is no dispute that Plaintiff received overtime pay when he worked more than 40 hours in one week, had his time approved by a supervisor, and timely submitted his time sheet. See Brown Aff., ¶ 24; Bronner Dep., p. 186.  Defendant maintains that Plaintiff received compensatory time pay when he submitted what he *later* claimed to have been inaccurate time sheets, claiming after the fact that he worked more hours than reflected on

---

[11](...continued)
and volunteer work as a youth mentor; and that both he and DeRigo had completed some college course work, but neither had obtained a college degree. Id. ¶¶ 43-46.

his originally-submitted time sheet.  See Brown Aff. ¶ 24.[12]

After his discharge, Plaintiff filed a complaint with the U. S. Department of Labor, Wage and Hour Division alleging that he was not properly paid overtime wages.  The Wage and Hour Division sent Defendant a notice indicating that it was commencing an investigation.  On June 13, 2007, Defendant agreed to pay Plaintiff $147.84 on his overtime claim "as a matter of convenience only" to avoid the expenses associated with the investigation.  In doing so, Defendant denied any "guilt or wrongdoing with respect to payment of wages."

### g.    Post-Employment - Unemployment Insurance

Following his discharge, Plaintiff applied for unemployment insurance benefits through the New York State Department of Labor. See Brown Aff. ¶ 21; Ex 8-10. Defendant challenged the application on the grounds that Plaintiff was terminated due to disqualifying misconduct. See Brown Aff. ¶ 21.  Although the Administrative Law Judge initially ruled in Plaintiff's favor, the Unemployment Insurance Appeal Board reversed the decision and determined that Plaintiff had been terminated due to disqualifying misconduct.  Thus, Plaintiff's application for unemployment benefits was denied.

Plaintiff contends that Defendant challenged his application because of his race and "in retaliation against me for making a formal complaint of racial discrimination to defendant's Human Resource Manager, Tonya Brown."  Pl. Aff. ¶ 74.  Defendant points out that it regularly challenges applications for unemployment insurance benefits where it

---

[12]For example, Plaintiff made a claim for additional time that had not been reflected on the time sheet he submitted for the pay period June 2, 2006 - June 16, 2006.  As a result, a separate check for compensatory time pay was issued to Plaintiff.

determines that the employee was terminated due to misconduct, regardless of the

employee's race.  For instance, in 2006, in addition to Plaintiff, Defendant challenged

unemployment insurance applications by three (3) Caucasian former employees who the

employer had terminated for violating Catholic Charities's employment policies. See Brown

Aff. ¶ 23; Ex. 7.

## IV.    STANDARD OF REVIEW

The Court will apply the well-settled standards for deciding summary judgment

motions in Title VII and other discrimination actions.  See Fed. R. Civ. P. 56(c); Weinstock

v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000); Patterson v. County of Oneida, 375

F.3d 206, 225 (2d Cir. 2004)(§ 1983);  Bracci v. N.Y.S. Dept. of Correctional Services,

2005 WL 2437029, at * 1 (N.D.N.Y. Sept. 30, 2005) (McAvoy, S.J.); Levitant v. City of New

York Human Resources Admin., 2008 WL 5273992, at *6 - *7 (E.D.N.Y. Dec.18, 2008).

These standards will not be repeated.  Suffice it to say that where, as here, the intent of

one party is in question but there is no direct evidence of discrimination, the Court must

carefully examine the reasonable inferences that could be drawn from the totality of the

circumstantial evidence and be cautious about granting summary judgment. Schiano v.

Quality Payroll Sys., 445 F.3d 597, 603 (2d Cir. 2006).   Nonetheless, "[i]t is now beyond

cavil that summary judgment may be appropriate even in the fact-intensive context of

discrimination cases." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir.

2001).

## V.    DISCUSSION

Unless stated otherwise, the same standards apply for resolving employment

discrimination claims under Title VII, the New York Human Rights Law,[13] and Section

1983.[14]

### a.    Disparate Treatment Claims

Plaintiff's disparate treatment claims are analyzed under the burden-shifting

framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct 1817, 36 L.

Ed.2d 668 (1973).  See Holcomb v. Iona Coll., 521 F.3d 130, 138 (2d Cir. 2008)(Title VII);

Patterson, 375 F.3d at 225 (§ 1983); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 765

(2d Cir. 1998)(state law claims).  This first requires Plaintiff to establish a *prima facie* case

of discrimination by producing "evidence that raises a reasonable inference that the action

taken by an employer was based on an impermissible factor." Holcomb, 521 F.3d at 138

---

[13]See Quinn v. Green Tree Credit Corp., 159 F.3d 759, 765 (2d Cir. 1998)(New York courts "require the same standard of proof for claims brought under section 296 of the Human Rights Law as for those brought under Title VII."); Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708 (2d Cir. 1996)(applying the same standard to Title VII & NYHRL); EEOC v. Rotary Corp., 297 F. Supp.2d 643, 661 (N.D.N.Y. 2003)("Title VII and the New York State Human Rights Law employ an identical standard to determine if the substantive elements of a hostile work environment [] claim have been proven.").

[14]Plaintiff sues for damages allegedly sustained by reason of a violation of, *inter alia*, "plaintiff's rights under the Constitution of the United States." Compl. ¶ 1. This is evidently an attempt to assert a claim pursuant to 42 U.S.C. § 1983. See Kern v. City of Rochester, Fire Department, 93 F.3d 38, 43 (2d Cir. 1996).

"A § 1983 action may not, however, be brought to vindicate rights conferred only by a statute that contains its own structure for private enforcement, such as Title VII." Patterson v. County of Oneida, 375 F.3d 206, 225 (2d Cir. 2004).  Because Title VII contains its own structure for private enforcement, Plaintiff may not bring a § 1983 claim premised upon the substantive rights provided by this statute. Id.  Nevertheless, Plaintiff may bring a § 1983 claim premised upon substantive rights distinct from Title VII. Saulpaugh v. Monroe Community Hosp., 4 F.3d 134, 143 (2d Cir. 1993); Patterson, 375 F.3d at 225.

Defendant has not addressed the viability of a Section 1983 claim in this case.  Assuming without deciding that Plaintiff asserts a cognizable § 1983 claim premised upon substantive rights distinct from Title VII, the Court will apply the same standard as applied under Title VII. See Feingold v. New York, 366 F.3d 138, 159 (2d Cir.2004) (assessing an equal protection claim regarding workplace discrimination under the Title VII framework); Patterson, 375 F.3d at 225 (same).

(internal quotation marks and citation omitted).  Plaintiff's burden of establishing a *prima facie* case is *de minimis*. Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).

> If the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to articulate "some legitimate, non-discriminatory reason" for its action. If such a reason is provided, plaintiff may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the presumption, that the employer's determination was in fact the result of ... discrimination. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

Holcomb, 521 F.3d at 138 (internal quotation marks and citations omitted).

### 1.    Failure to Promote Claims

Defendant moves to dismiss Plaintiff's failure to promote claims on the grounds that Plaintiff has failed to establish a *prima facie* case of discriminatory failure to promote. Plaintiff has not opposed this portion of Defendant's motion.

The failure to oppose a portion of a motion for summary judgment is deemed abandonment of the claim to which the motion applies, see Rizzo-Puccio v. College Auxiliary Services, Inc., 216 F.3d 1073 (2d Cir. 2000), and, in the Northern District of New York, is deemed consent to granting that portion of the motion. See N.D.N.Y.L.R. 7.1(b)(3).  Nonetheless, the Court must determine whether the movant has demonstrated entitlement to summary judgment on the claim. Bundy Am. Corp. v. K-Z Rental Leasing, Inc., 2001 WL 237218, at *1 (N.D.N.Y. Mar. 9, 2001)(Hurd, J.).

To establish a *prima facie* case of discriminatory failure to promote, Plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he applied for an available position for which he was qualified; (3) he was denied the promotion; and (4) the denial occurred under circumstances giving rise to an inference of discrimination. Howley v.

19

Town of Stratford, 217 F.3d 141, 150 (2d Cir. 2000)(citing McDonnell-Douglas, 411 U.S. at

802).  "[A] *prima facie* case cannot be established merely with evidence that a plaintiff

generally requested promotion consideration." Petrosino v. Bell Atlantic, 385 F.3d 210,

226-27 (2d Cir. 2004).  Plaintiff provides no evidence that he applied for a promotion to an

open "primary counselor" or a "senior counselor" position, or that he was excluded from,

or prevented from learning of, such promotional opportunities.

Assuming, *arguendo*, that Plaintiff established a *prima facie* case on these claims,

the claims fail on the third prong of the McDonnell Douglas test.  It is well-settled that in

employment discrimination cases, "the court must respect the employer's unfettered

discretion to choose among qualified candidates. . . .  Our role is to prevent unlawful hiring

practices, not to act as a 'super personnel department' that second guesses employers'

business judgments." Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 103 (2d Cir.

2001).

> Where [] discrimination claims are predicated on the employer's failure to
> promote the plaintiff, we must consider that "the employer has discretion to
> choose among equally qualified candidates, provided the decision is not
> based upon unlawful criteria. The fact that a court may think that the
> employer misjudged the qualifications of the applicants does not in itself
> expose him to Title VII liability, although this may be probative of whether the
> employer's reasons are pretexts for discrimination." Tex. Dep't. of Cmty.
> Affairs v. Burdine, 450 U.S. 248, 259, 101 S. Ct. 1089, 67 L. Ed.2d 207
> (1981).

Komoroski v. Dept. of Consumer Protection,  2008 WL 4876832, at *1 (2d Cir. Nov. 12,

2008)(unpublished decision).

Plaintiff has provided insufficient evidence from which a reasonable fact finder could

conclude that he was more qualified than other employees promoted into the senior or

primary counselor positions, or that he was prevented from applying for a promotion into

these positions.  Further, Plaintiff has pointed to no concrete evidence that race played any

role in the employer's promotion decisions.  His surmise as to the motivation of the

employer in making the promotions is insufficient to withstand summary judgment.  See

Bickerstaff v. Vassar College, 196 F.3d 435, 456  (2d Cir.1999);[15] id. at 448;[16] see also

Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).[17]  Therefore, Plaintiff's failure to

promote claims are dismissed.

### 2.      Failure to Provide 2006 Yearly Review

Plaintiff has also failed to oppose that portion of Defendant's motion seeking to

dismiss Plaintiff's claims asserting discrimination because he did not receive a yearly

review in 2006.  The undisputed evidence indicates that Plaintiff was one of several

employees, including Caucasian employees, who did not receive yearly reviews in 2006

because the supervisor responsible for completing the reviews left before completing the

reviews.  Other than Plaintiff's surmise, there is no indication that the failure to provide a

review was motivated by considerations of Plaintiff's race. Bickerstaff, 196 F.3d at 456.

---

[15] (Plaintiff's "feelings and perceptions of being discriminated against are not evidence of discrimination.")

[16] As indicated in Bickerstaff, on a motion for summary judgment the Court:

> must also carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture. This undertaking is not one of guesswork or theorization. After all, an inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist. Thus, the question is whether the evidence can reasonably and logically give rise to an inference of discrimination under all of the circumstances.

Bickerstaff, 196 F.3d at 448 (internal quotation marks and citations omitted).

[17] (A party opposing a properly supported motion for summary judgment may not rest upon conclusory allegations or unsubstantiated speculation.)

21

Further, Plaintiff did receive a raise in 2006 despite having no yearly review   Accordingly, there is an absence of evidence supporting the elements of a *prima facie* case of race discrimination related to the yearly review.  See Valenzuela v. River Bay Corp., 2007 WL 2435161, at * 7 (S.D.N.Y. Aug. 24, 2007).

 Assuming *arguendo* that a *prima facie* case exists, Plaintiff fails in his ultimate burden of establishing that the employer's proffered reason for the lack of review was a pretext for discrimination.  Therefore, all claims premised upon the employer's failure to provide a yearly review in 2006 are dismissed. See Richardson v. N.Y. State Dep't. of Correctional Serv., 180 F.3d 426, 447 (2d Cir. 1999),[18] *abrogated on other grounds by* Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed.2d 345 (2006).

### 3.    Overtime Claims

Defendant moves to dismiss Plaintiff's disparate treatment claim based on the purported denial of overtime wages.  Plaintiff has not opposed this portion of the motion in his Memorandum of Law.   While he asserts in his affidavit that  "Caucasian Boys of Courage staff, including but not limited to Wendy Halik, were given overtime pay," Plaintiff presents insufficient evidence to rebut Defendant's contention that he was paid overtime when he worked over 40 hours in one week, had his time approved by a supervisor, and timely submitted his time sheet.  He also fails to present sufficient evidence to rebut Defendant's contention that he was paid compensatory time on those occasions when he submitted what he *later* claimed to have been inaccurate time sheets.

---

[18](affirming summary judgment for employer where employee offered only her own general claim of discrimination to show that the employer's legitimate reason for terminating her was pretextual).

Plaintiff's bald conclusions fail to establish that considerations of race played any role in the Defendant's decision on how he was paid.  Therefore, the claims in this regard are dismissed.

### 4.    Discharge Claims

Plaintiff asserts that, because of his race, he was disciplined in a disparate fashion from similarly situated Caucasian employees, and that the accumulation of the employer's discriminatory discipline resulted in his discharge.  He has presented sufficient evidence to establish a *prima facie* case of discriminatory discharge.  See Windham v. Time Warner, Inc., 275 F.3d 179, 187 (2d Cir. 2001); Babcock v. New York State Office of Mental Health, 2009 WL 1598796, at * 4 (S.D.N.Y. June 08, 2009).

The employer asserts that each disciplinary action, including the ultimate discharge determination, was justified by the circumstances and instituted without consideration of Plaintiff's race.  This satisfies the employer's burden on the second prong of the McDonnell Douglas test and shifts the burden back to the Plaintiff "to demonstrate by competent evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" Patterson, 375 F.3d at 221 (interior quotation marks and citation omitted).

The ultimate inquiry is concerned with whether considerations of race played a role in the employer's decisions, not with the wisdom of the employer's disciplinary determinations.  See Janneh v. Regal Entertainment Group, 2009 WL 2922830, at * 9 (N.D.N.Y. Sept. 08, 2009);  Coleman v. Prudential, 975 F. Supp. 234, 239 (W.D.N.Y. 1997).  Plaintiff's evidence on this issue is scarce and amounts to, for the most part, bald

conclusory allegations or general denials.  The lion's share of Plaintiff's discriminatory

discharge case is premised upon the theory that, because the staff schedules were

destroyed, the employer cannot conclusively prove whether he was scheduled to work on

the dates for which he was disciplined for arriving late, leaving early, or changing his shift

schedule without supervisory approval.  From this Plaintiff seemingly argues that there

remains the possibility that there was no legitimate basis for the discipline.

The weakness with this approach is that the staff schedules are not the only

evidence of Plaintiff's schedule.  Supervisors with personal knowledge can testify to dates

when Plaintiff was scheduled to work, when he arrived late, when he left early, when he

changed his schedule without approval, or when he put in for more hours than he actually

worked.  Further, Plaintiff has not established the elements of a spoliation claim such to

require that an adverse inference be drawn against the employer for the destruction of the

staff schedules.  See Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d 93,

148 (2d Cir. 2008);[19] Port Auth. Police Asian Jade Soc'y of New York & New Jersey Inc. v.

Port Auth. of New York & New Jersey, 2009 WL 577665, at *1 (S.D.N.Y. Mar. 5, 2009).[20]

Nevertheless, Plaintiff provides *some* evidence, based on his personal knowledge,

---

[19] ("'Spoliation is the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc., 473 F.3d 450, 457 (2d Cir. 2007) (quoting West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999)). "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 436 (2d Cir. 2001). In addition, "[o]nce a court has concluded that a party was under an obligation to preserve the evidence that it destroyed, it must then consider whether the evidence was intentionally destroyed, and the likely contents of that evidence." Id.)

[20] (to warrant an adverse jury instruction on spoliation of evidence, the moving party must show: "(1) the party to be charged with spoliation was under an obligation to preserve it; (2) the destruction was done with a 'culpable state of mind,' and; (3) the destroyed evidence was 'relevant' to the moving party's claim or defense") (quoting Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 109-10 (2d Cir. 2001)).

that raises a question of fact as to whether there was a justifiable basis for *some* of the discipline imposed.  <u>See</u> Pl. Aff. ¶ 6;[21] ¶ 7,[22]  ¶ 10;[23]  ¶¶ 13-14;[24]  ¶ 17.[25]  Plaintiff also provides *some* evidence (although it is reed thin) that considerations of race played a role in the employer's disciplinary determinations. <u>See</u>  Pl. Aff.  ¶¶ 7-8.[26]  While the employer tries to rebut this evidence by arguing that similarly situated Caucasian employees were disciplined in a similar fashion to Plaintiff,  <u>see</u> Def. Mem. L., pp. 15-16,[27] the cited portions of the record do not indicate that Caucasian employees were discharged for the same infractions that Plaintiff was charged with committing.

The Brown Affidavit indicates merely that Caucasian employees were terminated

---

[21]("I never made schedule changes without permission.")

[22]("I deny the allegations contained in Desk Note 2/24/06")

[23]("I never made schedule changes without permission. While I was on vacation, my schedule was changed without my knowledge . . . . ")

[24]("I deny the allegations contained in the July 19, 2006 Corrective Action Plan for the reasons I wrote on the form itself.  I called Justin DeRigo and told him I had chest pains and a doctor's appointment. I deny the allegations contained in the July 24, 2006 Corrective Action Plan. I was not even scheduled to work during this period. . . .")

[25]("The allegations in the 8/11/06 Memo are false.  It never happened." )

[26]("Sometimes, I was a few minutes late, but so was the rest of the staff.  No Caucasian employee was disciplined for this infraction.")

[27] Defendant argues:

The only "proof" offered by Plaintiff to demonstrate the Defendants' stated reasons are pretextual are entirely conclusory allegations that Caucasian employees engaged in similar conduct but were not disciplined. By Plaintiff's own admission, though, he has no knowledge as to whether Caucasian employees contacted their Supervisors to advise they would be late to a shift, or whether Caucasian employees informed their Supervisors of a change in hours or a scheduled shift. <u>See</u> Bronner Dep., pp. 149-151, 154-157. In fact, no Caucasian employees engaged in the same type of egregious policy violations with respect to the issues for which Plaintiff was repeatedly counseled, and the record evidence proves that when Caucasian employees did engage in serious policy violations, they were discharged. <u>See</u> Brown Aff., ¶ 23; Harding Aff., ¶ 10.

"for misconduct."  There is no indication of the nature of the misconduct that these

employees committed. Brown Aff., ¶ 23.   Similarly, the Harding Affidavit leaves open the

question of whether Plaintiff was treated the same as similarly situated Caucasian

employees.[28]

While it may be that the frequency of Bronner's misconduct justified formal discipline

and, ultimately, discharge, it is a question of fact whether Caucasian employees who

"occasionally arrive[d] to work late or change[d] their hours" were disciplined and whether

these employees were similarly situated to Plaintiff in material respects. See Graham v.

Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000).[29]   Accordingly, the motion on this ground

is denied.

### b.   Retaliation Claims

Plaintiff asserts that he was retaliated against because he complained about racial

issues in his work place.  In this regard, Plaintiff alleges that Defendant retaliated by

discharging him and by challenging his application for unemployment insurance benefits.

### 1.   Retaliatory Discharge

"Retaliation claims are governed by the burden-shifting framework set out by the

---

[28]This affidavit asserts that:

[w]hile other employees at Boys of Courage would occasionally arrive to work late or change
their hours, none did so with anywhere near the frequency as Bronner.  In addition, except in
very rare occasions, other employees would follow the proper procedures and call a
Supervisor in advance when the employee was going to be tardy or notify a supervisor about
a change in shifts or hours.

Harding Aff. ¶ 10.

[29](whether two people are similarly situated is usually a question of fact for the jury)

Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>."  <u>Walker v. New York City Transit Auth.</u>, 2001 WL 1098022, at * 7 (S.D.N.Y. Sept. 19, 2001).  Defendant argues that, assuming *arguendo* that Plaintiff is able to establish a *prima facie* case of retaliation, his retaliatory discharge claim must be dismissed "for the same reasons that his unlawful race discrimination claims must be dismissed."  Def. Mem. L. p. 28.  Because the Court finds that a question of fact exists as to the justification of Plaintiff's discipline and discharge, and because Plaintiff asserts that he regularly complained about the use of racial language by the Boys of Courage residents, a question of material fact exists as to whether the discipline and discharge were motivated by considerations of Plaintiff's complaints.  Therefore, the motion in this regard is denied.

### 2.    Retaliatory Challenge to Unemployment Compensation Benefits

On the claim that the employer retaliated by challenging his application for unemployment compensation benefits, Plaintiff has provided insufficient evidence upon which a reasonable fact finder could find a retaliatory motive. The undisputed evidence indicates that the employer regularly challenged the applications of former employees that it believed were discharged for disqualify misconduct.  Here, the Unemployment Insurance Appeals Board concluded that Plaintiff was discharged for disqualify misconduct thereby confirming Defendant's belief.  Plaintiff has provided no evidence which would lead a reasonable fact finder to conclude that the employer's decision was motivated by considerations of Plaintiff's protected conduct.  Accordingly, the claims in this regard are dismissed.

c.      **Hostile Work Environment Claims**

Plaintiff asserts two discrete bases for his hostile work environment claims - co-worker conduct and resident conduct.  The two will be addressed separately. See Vajdl v. Mesabi Academy of KidsPeace, Inc., 484 F.3d 546, 550-51 (8th Cir. 2007).[30]  In order to prevail under a "hostile work environment" theory, Plaintiff must show: 1) that the workplace was permeated with discriminatory intention that was sufficiently severe or pervasive to alter the conditions of his work environment, and 2) that a specific basis exists for imputing the conduct that created the hostile work environment to the employer. Richardson, 180 F.3d at 436.[31]

### 1.      Hostile Environment - Co-worker Conduct

A "hostile work environment claim will succeed only where the conduct at issue is so 'severe and pervasive' as to create an 'objectively hostile or abusive work environment,' and where the victim 'subjectively perceive[s] the environment to be abusive.'" Richardson, 180 F.3d at 436 (quoting Harris v. Forklift Systems, 510 U.S. 17, 21-22 (1993)).  The objective aspect of this test is judged by a reasonable person standard. Id.  To analyze a hostile work environment claim, the Court "must look to the record as a whole and assess the totality of the circumstances, considering a variety of factors including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's

---

[30] (distinguishing the conduct of co-workers from that of the facility's youth inmates for purposes of addressing the plaintiff's hostile work environment claims)

[31] "Claims under the NYHRL are similar to federal sexual harassment claims and can be examined identically for summary judgment purposes, at least as far as determining whether sexual harassment has taken place." Seepersad v. D.A.O.R. Security, Inc., 1998 WL 474205, at *3 (S.D.N.Y. Aug. 12, 1998).

work performance.'" Gorzynski v. Jetblue Airways Corp.,  --- F.3d ----, 2010 WL 569367, at

*7 (2d Cir. Feb. 19, 2010)(quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S.Ct.

367, 126 L. Ed.2d 295 (1993))

        The Second Circuit has repeatedly held that "[i]solated, minor acts or occasional

episodes do not warrant relief" under a hostile environment theory. Brennan v. Metropolitan

Opera Assn, Inc., 192 F.3d 310, 318 (2d Cir. 1999)(citing Kotcher v. Rosa and Sullivan

Appliance Ctr., Inc., 957 F.2d 59, 62 (2d Cir. 1992)).  "Generally, unless an incident of

harassment is sufficiently severe, 'incidents must be more than episodic; they must be

sufficiently continuous and concerted in order to be deemed pervasive.'" Gorzynski, 2010

WL 569367, at *7 (quoting  Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002)).   "Plaintiff

must prove more than a few isolated instances of racial enmity. Casual comments, or

accidental sporadic conversation will not trigger equitable relief pursuant to the statute."

Snell v. Suffolk County, 782 F.2d 1094, 1103 (2d Cir. 1986).  Rather, "[t]here must be a

'steady barrage of opprobrious racial comments.'" Brady v. KBI Security Serv., Inc., 91 F.

Supp.2d 504, 508 (quoting Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997)).

        Plaintiff's co-worker hostile work environment claims rest upon allegations of a few

isolated and unspecified incidents of comments thought to be racist,[32] criticism thought to

be racially motivated,[33] and unspecified jokes by co-workers,[34] most of which were not

---

[32]For instance, Plaintiff alleges that co-worker Lisa Endres "made racially insensitive comments about
resident [T. S.] who is Hispanic, and his family, referring to them as beggars and also referring to the family's
living conditions in a negative and vile fashion."  It is unclear whether the "negative and vile fashion" that Ms.
Endres supposedly referred to the family had some objective racial connotation, or whether Plaintiff simply
perceived the comment as having a racial connotation.

[33]Plaintiff alleges that a co-employee Helene Speraco "racially harassed plaintiff and other
African-Americans at the workplace by discriminatory intimidation, insult and ridicule by comments such as

(continued...)

directed at Plaintiff or identified with any precision.  Although the Court can consider the

conduct directed toward others in assessing the general work atmosphere, see  Gorzynski,

2010 WL 569367, at *7, Plaintiff has failed to present sufficient evidence of actionable

race-based harassment.  The alleged co-worker conduct was not severe, was not

physically threatening, and amounted to sporadic offensive utterances. Patterson v. County

of Oneida, 375 F.3d 206, 227 (2d Cir. 2004).  While Plaintiff might have found the co-

workers' conduct to have created a subjectively hostile atmosphere, he has not asserted

conduct that a reasonable fact finder would find "'objectively' severe or pervasive - that is,

[conduct that] creates an environment that a reasonable person would find hostile or

abusive" such to interfere with an employee's work performance.  Brown v. Henderson, 257

F.3d 246, 252 (2d Cir. 2001); see McCoy v. City of New York, 131 F. Supp.2d 363, 372

(E.D.N.Y. 2001).[35]  Accordingly, Plaintiff's hostile work environment claim premised upon

the co-worker conduct is dismissed.

### 2.     Hostile Environment - Resident Conduct

Plaintiff's also alleges a claim of a racially hostile work environment based upon the

comments and actions of the residents.  He asserts that, although there were only limited

notations of such events in the employee logs, the conduct occurred on an almost daily

---

[33](...continued)
the Black employees were lazy, by constantly questioning only the Black employees' work ethic and by calling
plaintiff lazy in front of the residents."  He admits, however, that he never heard Helene Speraco state that "all
the Black employees are lazy"

[34]Plaintiff does not remember the substance of any "black joke" allegedly told by Lisa Endres.

[35]("For acts of racial discrimination such as racist comments, slurs and jokes to be actionable, there
must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs
there must be a steady barrage of opprobrious racial comments.")(citation omitted).

basis and involved physical treats as well as a steady barrage of opprobrious racial

comments.  These allegations support both the subjective and objective components of a

hostile environment claim.  Thus, the viability of the claim turns on whether there is a basis

to hold the employer liable for the actions of the non-employee residents.

Courts have held that an employer may be found liable for the harassing conduct of

non-employees, including inmates and residents in youth centers, if the employer knew or

reasonably should have known of the harassment yet failed to take appropriate corrective

action. See, e.g., Freitag v. Ayers, 468 F.3d 528 (9th Cir. 2006);[36] Randolph v. Ohio Dept.

of Youth Serv., 453 F.3d 724, 734 (6th Cir. 2006);[37] Slayton v. Ohio Department of Youth

Services, 206 F.3d 669, 677 (6th Cir. 2000);[38] Garrett v. Dept. of Corrections, 589 F.

Supp.2d 1289, 1297 (M.D. Fl. 2007);[39] Powell v. Morris, 37 F. Supp.2d 1011, 1017 (S. D.

Ohio 1999);[40] see also Martin v. City of New York, 191 Fed. Appx. 71, 73-74, 2006 WL

2169188, at  *2 (2d Cir. July 31, 2006)(unpublished opinion);[41] Watson v. Blue Circle, Inc.,

---

[36] (state department of corrections could be held liable under Title VII for failure to implement policies to protect its female corrections officers from sexual harassment by male prisoners)

[37] (holding that liability to facility attaches where coworkers sat idly by as plaintiff was subjected to multiple physical attacks)

[38] (upholding jury verdict in favor of female officer subjected to sexual harassment by male inmates where guards "encouraged, endorsed, and even instigated the inmates' harassing conduct and where ""the institution fail[ed] to take appropriate steps to remedy or prevent illegal inmate behavior.")

[39] (a corrections department can be held liable for inmate sexual harassment directed at female employees, particularly when it is shown that the department refused to take appropriate corrective action)

[40] (noting that prisons may be liable for sexual harassment where they fail to take "proper preventative and remedial steps with regard to inmate behavior.")

[41] ("The jury therefore could have properly found Title VII liability: the evidence supports the reasonable inference that Martin was treated differently from her male colleagues and that defendants instigated the inmates' offensive behavior.")

324 F.3d 1252, 1258, n. 2 (11th Cir.2003);[42] but see Vajdl, 484 F.3d at 550;[43] Weston v. Pennsylvania, 251 F.3d 420, 427-28 (3rd Cir. 2001).[44]

Here, the employer responded to Plaintiff's complaints about the residents' conduct by modifying the House Rules, and by allowing Plaintiff to act on his suggestions for addressing the conduct even though Plaintiff did not follow through and present a written proposal as he was instructed to do.  While Plaintiff may have been dissatisfied with the results of the responsive actions, the test is not whether Plaintiff received the results he wanted but whether the employer took reasonable steps to curtail the conduct.  Given the age and psychological characteristics of the residents, the total elimination of the residents' statements and behaviors was unlikely.  No reasonable fact finder could conclude that the employer sat idly by and did not take reasonable efforts to curtail the objected-to conduct. Therefore, the motion on this ground is granted and the claims based upon resident's conduct are dismissed.

### d.   New York Civil Rights Law §§ 40-44a Claims

Lastly, Defendant moves to dismiss Plaintiff's claims brought pursuant to New York Civil Rights Law  §§ 40-44a for failure to provide notice to the New York Attorney General.

---

[42] (an employer may be found liable for the harassing conduct of non-employees if the employer knew or reasonably should have known of the harassment and failed to take immediate and appropriate corrective action)

[43] ("To impose liability upon the Academy for the inappropriate sexual expressions of severely troubled youth would not be reasonable without evidence of special circumstances.  We, therefore, conclude that, in the absence of special circumstances not present here, the conduct of inmates cannot be attributed to an employer in order to show that the harassment affected a term, condition, or privilege of employment.")

[44] ("Weston's complaint indicates that he was subjected to comments, jokes, and jibes by unspecified inmates.  Absent further amplification - for instance that prison officials encouraged the inmate's comments, or that prison officials knew of the harassing conduct but failed to remedy it - this mere allegation is insufficient to state a Title VII claim.")

Plaintiff has not opposed this portion of the motion.

Plaintiff appears to be bringing his claim pursuant to § 40-c, the only section that seemingly gives rise to a private cause of action in the instant situation.  See N.Y.C.R.L. §§ 40-44a; see also Feacher v. Intercontinental Hotels Group, 563 F. Supp.2d 389, 407 (N.D.N.Y.2008);[45]  Whiting v. Incorporated Village of Old Brookville, 8 F. Supp.2d 202, 212 (E.D.N.Y. 1998).[46]

> However, in order for a plaintiff to bring a cause of action pursuant to New
> York's Civil Rights Law, a plaintiff must notify the New York State Attorney
> General "at or before the commencement of any action under this section."
> N.Y. Civ. Rights Law § 40-d.  "Failure to comply with [this] statutory
> prerequisite mandates dismissal of the claim."  Shepard v. Frontier Commc'ns
> Servs., Inc., 92 F. Supp.2d 279, 287 (S.D.N.Y. 2000).

DiPilato v. 7-Eleven, Inc., 662 F. Supp.2d 333, 354 (S.D.N.Y. 2009).

There is no indication that such notice was given.  Therefore, the motion in this regard is granted and the claims pursuant to  New York Civil Rights Law  §§ 40-44a are dismissed.

---

[45](discussing claims brought under N.Y.C.R.L. §§ 40 & 41).

[46](N.Y.C.R.L.  § 44-a(1) "is a criminal statute which does not give rise to a private cause of action.")

33

## VI.    CONCLUSION

For the reasons discussed above, Defendant's motion for summary judgment [dkt # 12] is **GRANTED IN PART and DENIED IN PART**.  The motion is granted to the extent that all claims, **other than** the claims alleging discriminatory and retaliatory discharge and the state common law claims alleging negligence and gross negligence, are **dismissed.**

**IT IS SO ORDERED**

DATED:March 15, 2010


Thomas J. McAvoy
Senior, U.S. District Judge

34